We'll hear argument next in Case 17-587, the Mount Lemmon Fire District v. Guido. Mr. Rosenkranz. Mr. Chief Justice, and may it please the Court, the Ninth Circuit fixated on two words in a two-sentence definition of employer. It ignored how the second sentence relates back to the first. It jumped right to the second half of the second sentence without considering the first half, and it ignored how all of this relates to the foundational definition on which the definition of employer is built. Now, predictably, that wreaks havoc with the statutory scheme, most notably by stripping public employees of crucial protections like respondeat superior, and also by treating public employers worse than private ones in a statute whose purpose was to bring parity to the two. Now, as our brief explains, the best way to read the statute is from beginning to end, but let me just start right in the middle, as my colleagues do, with the phrase that is causing all this mischief, also means Respondents do not dispute that that term can have two alternative meanings. It could mean, in addition, there is an additional universe beyond that which is defined in the first sentence, or it could mean further elaboration of the preceding definition along the lines of moreover or incorporates. So how do we know which one is intended? The rest of the context makes clear, and in particular, there are five separate statutory signals, any one of which pushes the reading in the direction that we've and the interest in making sense out of anti-discrimination law. So let me start with the first one. Ginsburg-Ganz, what you say about making sense, perhaps Congress should have used the formulation that was used in Title VII, where it's clear, Title VII is absolutely clear, the numerosity requirement goes to private and public employers. But this statute, ADEA, picks up on the language of the Fair Labor Standards Act, which has no numerosity requirement. So perhaps Congress should have done what you suggest, but by using the Fair Labor Standards Act language rather than Title VII language. If they wanted to do what Title VII had done in 1972, they wanted to do that in 1974, why didn't they use Title VII language? Rosenkranz. Well, Your Honor, let me start with the premise and then turn to the ultimate question. The premise of the Your Honor's question is that Congress used the definition from the FLSA. I urge the Court to look at the definition in the FLSA. It is on the first page of the government's statutory appendix. It is entirely different from this definition. Why did Congress use a different approach from Title VII when everyone understood at least everyone who was talking about it understood that the purpose was to mimic what Title VII did? I am attributing rationality to someone who was obviously not doing his job very well, but Title VII began with different language preamendment from the language in the ADEA. Title VII began with language that was not as expansive about the definition of person. So here we have an extremely expansive definition in ADEA or any organized group of persons. It is the most expansive definition this Court has ever seen of person. Sotomayor Expansive in only one way. That entire list up to the disputed any organized group of persons all apply to private entities. Rosenkranz No, not at all, Your Honor. Sotomayor No, Justice Sotomayor. Corporations, this Court has held in at least five cases that corporations includes municipal corporations. This language in every statute, put aside those last four words, corporations and associations, every time this Court has encountered that phraseology, it has concluded that political subdivisions are persons. It did it in Ricketts. It did it in the city of Chattanooga. It did it even without a definition in cases like Monell and in the Federal and the False Claims Act. Roberts Well, but here, it's not just persons, it's organized groups of persons. And it's in a list of things, that is, partnerships, associations, labor organizations, corporations, and organized groups of persons. I just don't think it's a natural reading to say, what, I belong to the city of Bethesda. List organizations you belong to. Well, there's this partnership, this, and Bethesda. Rosenkranz Well, so two answers to that, Your Honor. First, even without that language, this Court has found that striking that out, this Court has found that the definition before that language covers political subdivisions. City of Lafayette, Chattanooga Foundry, and Ricketts all found that. But Mount Lemmon Fire District is most certainly an organized group of persons, landowners under statute, to get together to find a common cause and collect taxes around it. Sotomayor Counselor, even if it's true in those cases, what's different from those cases and this one is that the original statute made clear that that definition was not going to include States or Federal government. So given the sort of private nature of most of the listing and the fact that the statute on its face says it, no matter what you do, it's not States or government, I would read it in its natural form, and I wouldn't include it unless I'm told to include it otherwise. Rosenkranz Your Honor, I beg to differ with how the statute is structured. So we start with the definition of person in subsection A. That is broad and expansive. Subsection B then subtracts. It says it's not the Federal government. Oh, and by the way, it's not States, that is employer. Let me back up. Employer then says it's any person and, you know, 20 or more people, 20 or more employees. And then it goes on and subtracts the Federal government and States and local governments. It makes no sense to subtract them unless they were included initially. Sotomayor No, it makes no sense to subtract them unless you never intended to include them. Rosenkranz Your Honor, that is certainly not the way this Court has read it. It's certainly not the way Title VII does it. Sotomayor You assume an ambiguity that the statute can be read in two ways. You're not saying the way the Court below read it was not permissible. You're just saying a better reading is your way, correct? Rosenkranz That is correct, Your Honor, but let me put it a slightly different way. I'm not just assuming. The other side has not disputed that there are two possible ways to read it. Our position is that when you take these five statutory clues, which I have only just begun to get to, the only reasonable reading is our reading. So we've already talked about the person's one, but there's more. I would have started with the very first signal. We know that also means does not signify an additional category of covered employers. Because that's Roberts If we disagree with you about the meaning of also, do you have any other argument available to you, or is that the end of the case? If we adopt the normal meaning of also, meaning in addition to, do you lose? Rosenkranz No, Your Honor. But let me just make sure. First, this Court has routinely adopted statutory constructions that defy the best dictionary definition. Roberts That wasn't my question. My question is if we take the best dictionary definition in addition to the normal meaning, do you lose, or do you have some other available argument? I'd be delighted to hear it if you do. Rosenkranz So I think we have another argument, Your Honor. So also means means in addition, and so it adds agents, which I'll get to in a moment, is completely implausible. And then what does it do in the next clause? Roberts You use those words a lot. And your reply brief uses the other side of allusions, distortions, disastrous and preposterous results, contradictions and anomalies, pretty strong language, and also contortions. That's in the first page and a half of the reply brief. And I didn't see, though, and I guess I expected to see some sort of absurd results argument, perhaps, that if we're going to use that kind of language, but I didn't  So it made me a little concerned. Rosenkranz Well, Your Honor, let me tell you what the absurd result is. So let's start with the agent clause. The government's position is that also means necessarily adds a category not otherwise covered. If that is true, who are the classic agents? Employees are the classic agents. That means employees are now directly liable under the statute for any cause of action on discrimination. Now, that's Ginsburg So is it that anyone would sue an employee rather than the employer? I mean, sue an employee, doesn't have much in her pocket, sue the employer. It seems to me most unlikely that you would, if you could. Rosenkranz Your Honor, I disagree with you. It has happened in every circuit under Title VII. Employees have been sued, sometimes along with the employer, and that would be disastrous I mean, first of all, supervisor liability could stretch into the millions of dollars. Ginsburg It is a disastrous? You said under Title VII, employees are being sued. Is it disastrous under Title VII? Rosenkranz No, sorry, Your Honor. I'm saying it has happened under Title VII, and every circuit has said, no, no, no, you can't do it. Why? Because as this Court found in Burlington, that is not what the agent clause does. What the agent clause does is incorporate respondeat superior liability, which is to say Sotomayor My point was made by the majority of circuits who ruled in your favor. Those circuits still had to deal with the agent meaning, and they've dealt with it by addressing respondeat superior liability. However they've dealt with it, your meaning doesn't do away with that tension. Rosenkranz Your Honor, our meaning most certainly does. We have a complete disagreement with the government and respondents on what the agent clause does. We believe it incorporates respondeat superior liability, which makes the employer liable for the agent's activities. The government and respondents say, no, no, no, it adds another category of people who have not been previously identified as employers. Anyone who is now a new employer is subject to liability, and you can tell that  there is no agent involved in this case, so why should the Court address that language that the term also means an agent of such person? Rosenkranz Well, Your Honor, for the simple meaning that everyone has agreed, and the respondeats have conceded in their brief at page 32, that the phrase also means has to carry the same meaning with respect to both clauses. So you can't just jump over one and not ask, what would also means produce if you apply that to the first clause?  Mr. Rosenkranz I think you get – your argument comes back and bites you, I think, because you just said they have to be treated the same, one and two. Your theory with respect to two, a State or political subdivision, is that it's already included in the first part of the statute. So that would seem to be an argument you have to make with respect to one, the agent, that the agent of such a person is already included in the first part. So I don't see how your argument answers the problem that you used to undermine the other side's argument. Breyer Well, Mr. Chief Justice, it does for the following reason. What does the also means clause do? It's an avoidance of doubt clause. It avoids doubt in two different ways. The first way is by adding that agent clause and saying employers, the aforementioned employers, that universe, are subject to respondeat superior liability. The second clause also avoids doubt by making it clear that when you are talking about employers, those persons defined in the first sentence, you are including political subdivisions and States. And I have to emphasize that you know that the agent clause is problematic because of the extremes to which Respondents go to redefine agent. They define agent to mean third-party independent subcontractor because they cannot accept the possibility that, as is clear under the common law for hundreds of years, agents, the classic agent, are employees. So without the agent clause, excuse me, when you define the agent clause the way Respondents do, you do end up with a disaster. Kagan. Kagan. Mr. Rosenkranz, in the term also means in that sentence, you agree, don't you, that the term is the same term as in the first sentence? In other words, the term is employer. Is that correct? Rosenkranz. The term is what? Kagan. Employer. The term employer also means. I mean, here are your two choices. Rosenkranz. The antecedent. Kagan. The term employer or the term person? Rosenkranz. I'm sorry. Kagan. What is the term in the second sentence? Is it an employer? Rosenkranz. Oh, yes. The term employer also means. Kagan. So it's just odd, because you say that what this clause is meant to do is to make clear that person is defined in such a way as to include subdivisions. So what you're essentially doing is converting the phrase which says the term employer also means and converting that into the term person, just to make clear, includes. Rosenkranz. No, Your Honor. No. What we are doing is referring back to employer. So the first sentence says who is an employer. Who is an employer? An entity that has at least 20 employees and that affects commerce. Now, that is a universe. The term, in our view, also means, clarifies that within that universe, we're doing two things. We're applying agency liability to that universe of aforementioned persons who are now labeled employers. Kagan. But the clarifying with respect to the subdivisions would not be necessary, except for the fact that there is doubt in the person definition. That's where your doubt comes from. It comes from the fact that the person definition is not unambiguous. That is one of the sources of the doubt. I don't know. What is the other source of the doubt? It's all the source of the doubt, isn't it? Well, no, because there are other statutory problems that get created completely apart from that. So first of all you say that there are anomalies if done in a different way, but the doubt arises from the ambiguity of the term person. So that's why I'm suggesting that it would be a strange way to resolve that doubt instead of to just say, by the way, a person includes a subdivision, instead of saying that, to say the term employer also means a subdivision. Understood, Your Honor, this is a strange statute that was written in a strange way. There is a reason for that. This gets to one of my other statutory clues, and that is when you think about the evolution of this statute, it was different from Title VII. This statute has two sentences within that definition, not one, and this statute always had also means within that definition. So if you think about what was going on, we map it out on page 8 of our brief, what the editor was trying to do, or if you look at page 8, there is a red line. The basic point is this. This statute always had the same structure. The second sentence always had also means in it. But that second sentence had two parts. One was clearly a clarification, and the second was an exclusion. The clarification was as to agency, and then there was an exclusion. What did the drafter do? They just took part of the exclusion and moved it to the other side of the also means sentence so that now it is serving that clarifying purpose. Breyer, tell me, if a company, the XYZ Company, has 50 employees, and one day they think, I have an idea, what we'll do is we'll set up five subsidiaries, and they will hire the employees, each will hire ten, and they will be our agent and do everything that we tell them, okay? Does the statute apply? Absolutely, Your Honor. XYZ is liable for the acts of their agents. Under Respondent's position, XYZ doesn't. But the agency isn't a — the subsidiary is not an employer. Your Honor, so you've said — I said the XYZ Corporation sets up five subsidiaries, each of which has ten employees, and it's an agent, so — I mean, were they — yes, it's an agent of the XYZ Corporation. It tells them what to do. Well, Your Honor — The XYZ Corporation has no employees. It just has five subsidiaries. Okay. So there are two scenarios. One is that each of the subsidiaries is liable. Why? They each have ten employees. Oh, I see what you're saying. Yeah. So — so what — so what this Court — I would say Manhart kind of addresses that question, that you cannot avoid liability by turning yourself into subsidiaries who are all your agents. Where does it say that? Where does Manhart say it? Yeah. I mean, where does he say that? I mean, where does the statute say that? Because it did occur to me that one purpose that A could serve is doing just what you said. You cannot turn yourself into five subsidiaries. And that's why the subsidiary part, namely the agent part, doesn't have a number attached, because they don't want a number attached. They want you to set up a hundred subsidiaries each with one employee and get out of the statute. So let's just be clear. Private entities are always covered under this — under this statute. I'm not talking about public agents. But private entities, it says, the term employer is a person — maybe I've just gotten mixed up. I don't think so. It means a person engaged in an industry who has 20 or more employees. So what I'm trying to imagine is through the use of subsidiaries, there is no company that has more than 10 employees. And to avoid that, one thing they might have wanted to do is to use the word agency without a qualification that the agency has to have 20 employees. So, Your Honor, all I can say is there's no reason to believe Congress was ever focused on that — On that problem. — on that scenario. That was never before Congress. What was before Congress and what this Court held as to Title VII in Burlington is that that language is about respondeat superior. But let me get — I've already mentioned two clear signals. Let me get to the third one. Which is a variation on the agent point. While we disagree on what the agent clause does, everyone agrees that it does something important. At a minimum, according to Respondents, it protects employees from the independent — excuse me, from the discriminatory acts of independent contractors. So the question arises, why did Congress supply that important protection only to private employees and not to public ones? Because that is the consequence of Respondents' reading. Fourth signal, affecting commerce. And what Congress did with that phrase — now, for now, I am not making a constitutional argument. I am making a drafting argument. In every one of these discrimination statutes, Congress felt the need to provide an explicit commerce clause hook. It did so for private employers under the ADEA. It did so for all employers, public and private, under Title VII and the ADA. Now, one can have an interesting constitutional debate about whether that hook was constitutionally required, but my point here is simpler. Congress thought it was necessary in every other context, so why would Congress have left it out here? And then the fifth statutory clue is the statutory history. And I've already described how the drafters got to where they got. But let's look at two things. The first is how they got — how they changed the language in 630B. So they took words that had a particular — that were on the exclusion side, and they moved it to the inclusion side. We've been accused of reading the statute in a way that makes that superfluous. It is not. It was absolutely essential to identify who is now in the ambit of the statute. It was essential because that was the major change. Now, look at 630C. We don't have a red line in our brief on this one, but you can see it in the government's statutory appendix at — excuse me, you can see it in our statutory appendix. So the term employment agency, it's defined there. It means anyone. Originally, it said, but shall not include any agency of the United States or any State or political subdivision of a State, except such terms shall apply, and so forth. Congress crossed out everything after the United States. The only reason to have done this would have been to now include States and political subdivisions within the definition of employment agency. The only way that could possibly happen is if they were persons to begin with, and therefore, if they were persons to begin with, you flow them through a subdivision or subsection B, and they are subject to the same employee limit. Now, if the purpose of that second sentence was to take entities that were already persons, and therefore, subject to that first sentence, encompassed by that first sentence, and make it clear that the proviso about the size no longer applies, this was a very strange way to do it. If there are no further questions, I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. Thank you. Mr. Fischer. Mr. Chief Justice, and may it please the Court, the plain text of the ADEA makes absolutely clear that it covers political subdivisions regardless of size, and there's nothing odd, much less absurd, about that result. Let me start with the text and clarify one thing for the Court. My friend says that we do not dispute that also means. The key statutory phrase here can mean different things, but the truth is we actually do dispute that. The meaning of also means is additive. It adds something that wasn't there before. And the confirmation of that is found throughout the U.S. Code. In our brief, we cite the 32 other instances in the U.S. Code where the phrase also means appears in a definitional statute. All 32 of those phrases of statutes use it in an additive manner. And I think perhaps the most telling one is the one that's not there. One doesn't. And how do you deal with that one? If you're speaking, Justice Sotomayor, of the consumer statute that my friend points to, I think it does use it in an additive manner, because that's a statute where it says consumer means an individual who does certain things, or the person's legal representative. And so that itself also means the person's legal representative. That itself is additive. This is not a statute talking about, for example, a court of law where someone's legal representative is the alter ego of the person. That's a situation where it's additive. Sotomayor, you don't really think that what the statute meant is that the legal representative was giving his or her private information. It's not additive in that sense. It's sort of that legal representative is giving the consumer's information to someone. And so the legal that's the violation, isn't it? Fisherman, I think that's right, Justice Sotomayor, but it's still talking about a different source than the previous part of the statute. And I think if there's one potentially ambiguous provision out of 33, we'll still take that. And I would turn the Court to the perhaps I think the most telling example, which is the one at pages 12 and 13 of our brief about elderly families. And I think the reason why that's so telling is because it gives a particular definition and then has a qualification at the end, or is also handicapped. And then it says the word also means such and such, and then it repeats that phrase, or is also handicapped. And so Congress, when it uses the word also means, it did exactly the opposite of what my friend says you should read the statute here to do, which is to carry forth those carry down to after also means the original thing should come before. Sotomayor, it is either superfluous or there's a question whether a State employment agency is still covered or not. Fisherman, I think, Justice Sotomayor, the latter might be the case, but it's not Sotomayor, it is superfluous under your reading. Fisherman, the Federal agency? Yes. And I think, well, it's not superfluous in the sense that just as the key provision here, subsection B, the Federal government is backed out at the end in a situation where I think the better reading might have been to leave them out in the first place. And I think the reason why you see explicit references to the Federal government in both places is because for two things. One is the Court itself has asked Congress in various ways to speak directly when it talks about Federal government or States being on the hook for one form or another. And secondly, the Federal government is itself treated wholly separately in section 633a under a different regime of the ADEA. So the Federal government is just put aside in all these other provisions, and I think that's what Congress was doing there. So we submit to the Court that also means is simply unambiguous. That's the end of the case, just as the Ninth Circuit said it was. If the Court has any doubt about that, I would urge the Court to look, as my friend I think also urges, to the comparison between Title VII on the one hand and the FLSA on the other hand. And I think the other hand is that the Federal government is not going to be able to do that. Alitos, do you think it's plausible that Congress would have said, you know, when it comes to racial discrimination, we're not going to allow a suit against a government entity with fewer than 25 employees, but when it comes to age discrimination, we're going to include every government agency, no matter how small? I think absolutely, Justice Alito, and the reason why goes back to Lorillard v. Pons and the other cases where this Court has described the genesis of the ADEA. So the word the Court has used is that the ADEA is a hybrid. It's a hybrid between a substantive anti-discrimination law on the one hand and a labor statute on the other. And that's borne out in the provisions of the ADEA, which borrow the substantive anti-discrimination part from the Title VII language, but the rest of the statute is largely drawn from the FLSA. And in the case of the ADEA, it's a hybrid. Alitos, do you think it's plausible that Congress would have said, you know, when it comes to racial discrimination, we're not going to allow a suit against a government entity with fewer than 25 employees, no matter how small? I think absolutely, Justice Alitos, and the reason why goes back to Lorillard  In the legislative history, you find elements, and I'm going to answer your question directly, I think, you find in Title VII that Congress was concerned with associational interests, personal associations. So one of the things behind the numerosity requirement in Title VII is a concern about forcing very, very small groups of people to associate with individuals they might not like. Now that might seem antiquated nowadays when we're talking about race relations and race discrimination, but it's directly in the legislative history of Title VII. On the other hand, this goes back to the ADEA being partly a labor statute as well. The purpose of the ADEA is to bring people into the workforce and keep them there and to achieve full employment of older individuals. And as the Secretary of Labor noted in the report this Court discussed in EEOC versus Wyoming, that was not to stamp out animus-based discrimination like under Title VII, but to achieve full employment. And so the reason why Congress may have decided to have public agencies, regardless of size, on the hook, on the age side, and not on the race side, is because of this associational interest requirement. Kagan, Is this, Mr. Fisher, the only Federal statute that you're aware of that imposes an obligation on a small political subdivision, but not, does not impose the corresponding obligation on a small private employer? Fisher, No, and let me point you to two things. First of all, the other component of the ADEA itself, which I think no one disputes, covers Federal governmental employers, regardless of size. So we find that in the ADEA itself. And as to State and political subdivisions, you find a close analogy in the FLSA. Now, my friend says in his reply brief the FLSA has no numerosity requirements at all on the private side of the FLSA. That's strictly speaking true, but enterprise liability under the FLSA depends on that, which is the predominant form of liability, depends on an employer having at least $500,000 of gross receipts per year. So you have a kind of rough analogy in that statute to a numerosity requirement. In other words, you have a firm that has to be of a certain size. And I'd add, Justice Kagan, you asked me just about Federal, but as we cite in our brief in the lengthy footnote, there are many, many States, the majority of States, in fact, that cover political subdivisions, regardless of size. Of that group, about half of them cover political subdivisions regardless of size and, on the other hand, still have a numerosity requirement for private employers. And I'll take that one step aside. Ginsburg-How are those State statutes raised in comparison to this statute? Fisher-I didn't hear the beginning, Justice Ginsburg. Ginsburg-The State statutes, you said that most States include political subdivisions without regard to size. And do we have language in what the language that most States use? Is it similar to the language that's used in the AEDEA or? Fisher-Well, Justice Ginsburg, these citations are all collected in footnote 6 on page 29 of our brief. And the answer to your question is, by and large, the State statutes actually use different language. So it's not a case where the States are merely parroting what the AEDEA already says. I think of our count, there are only three States that have the exact same language of the AEDEA. The vast majority have other language that makes it clear in other ways that they are distinguishing on numerosity terms between one and the other. And the thing I would add to that, Justice Ginsburg, is that a handful of those States had that distinction even before the AEDEA was passed. So the thing that my friend says is ludicrous for Congress to have achieved actually was in State statutes already. Many State legislatures across the country had already drafted statutes like this before the AEDEA was passed. And so I think, Justice Alito, to bring me back to the conversation that I was having with you about the reason why Congress might have done this to distinguish between race and age, I will grant that Congress could have reasonably made the other choice as well. I think that Congress could have decided one or the other, but the proof is in what Congress actually did. And as I said, it had the FLSA on the one hand and Title VII on the other hand. And the two statutes were identical in the sense that when you look to the definitional provisions of the Act, you found first a definition of the word person, and then you found a definition of the word employer. And so what did Congress do in Title VII? It amended the definition of person to achieve, as Justice Ginsburg pointed out, a very easy solution where the numerosity requirement applied to political subdivision When it amended the ADEA in the exact same Act that it amended the FLSA indisputably to cover political subdivisions regardless of size, it did the same thing it did in the FLSA, which is amend the definition of employer and not the definition of person. And I would point this Court to its own decisions in cases like Gross and Nassar, which say that we look to not just the language choices Congress made and assume it's intentional, we also look to structural choices that Congress makes, and we assume those are intentional. And so even if I had nothing but the comparison between the ADEA and Title VII, under those cases, I think that would be enough to remove any doubt that the Court might have about what Congress was trying to achieve here. But actually, I have something more here. I have the FLSA, of which the ADEA is closely related, and the Congress made exactly the same decision in the FLSA. Alito, would you say something about what your argument means for the agent clause? If Congress wrote also means, it didn't put includes, had it written the term employer includes any agent of such a person, I take it that one could not be an agent without having 25 employees. But what — where does your understanding of this sentence take us with respect to agents? Justice Alito, let me answer that question, if I may, in two steps. I want to first start with my point of agreement with the other side, which is we agree that the key question is whether also means adds something, even with respect to the agent clause. We think that's an important question for the Court to ask. But this brings me back to Justice Breyer's question, which is I don't think there can be any reasonable dispute that the agent clause does add additional entities into the category of employer, and it's not just the below-20 thing. More fundamentally, it's agents that would not otherwise be covered by responding at superior. That's what the Court noted in Manhart, and we explain in our brief in cases like Spurt, and there's also footnote 1 in the Solicitor General's brief, that explain that some independent contractors, for example, and that's just to use one example, are agents of an employer but are not covered by responding at superior. Breyer, where do I look on that? Because I was bothered exactly by the same thing that Justice Alito said, that if we're not going to have numbers with B, we're not going to have numbers with A. And I think your colleague says, well, they didn't want to – they wanted numbers – all that A does is just make sure it's principles of agency, and he cites Burlington. So where would I look to see, no, they had another idea. They wanted some agents covered who had fewer than 20 or 25 employees. Fisherman, Well, Justice Breyer, I don't think you'll find a sentence to that effect in those slides of history, but let me make clear on one thing, which is the 20-employee thing is just the very beginning of their problems. The much bigger problem is an agent of any size would not be covered but for that clause, that would not be under responding at superior principles. Now, my friend in the reply brief says that we distort the meaning of independent contractors, but I urge you to read the rest of the sentence that my friend quotes in the commentary to Section 14N, and also to look at Section 2 of the Restatement of Agency called independent contractor. And in both those places, the restatement makes clear that some independent layoffs, choose who's going to be laid off, administer our benefits plan, and decide what the criteria are for that. Those kinds of people are agents, but they're not necessarily covered by responding at superior. So my friend, in his reading of the Agent Clause, to do nothing but clarify what has come before, leaves a gaping hole in the ADEA and also in Title VII. Kagan, But I guess I wonder, Mr. Fisher, how your reading of the Agent Clause allows us to make this distinction that both you suggest and the Solicitor General suggests between entities and individuals. I mean, it says, any agent of such a person, and it doesn't on its face make any such distinction. So how would we go about doing that? Fisher, So I think there's two questions you would ask if you had a case dealing with the Agent Clause, Justice Kagan. I think this is responsive to Justice Alito as well. The first question you'd ask is whether any agent includes employees. Now, obviously, the word any might suggest that it does, but on the other hand, employees are already covered under respondeat superior principles once you've already given the word employer. So it would be kind of a mystery and odd why Congress would have wanted agents to be speaking about employees, especially when another provision of the statute defines the word employee, and it's used other ways in the statute. So the first question would be whether any agent means any agent whatsoever or just non-employee agents that aren't already covered. If you answer that question against, you know, but I guess would be my position as I stand here, you'd still have a second question, which is if individual supervisors, for example, were on the hook, the question would still be how are they on the hook? And as we note in the Solicitor General notes as well, the Fourth and Fifth Circuits have held, yes, they're technically liable, but they're liable under something like official capacity principles. So they flow right back to the employer as one would expect in any employment arrangement. So you'd have two questions that would get you off the train to where my friend would like you to leave you with that clause. But I think the fundamental thing that I would urge to the Court is that you have before you in this case a simply unambiguous statute in terms of every word you need to decide this question presented. It says the term employer also means a state or political subdivision. That's all you need to decide this case, and it is absolutely clear. I'd urge the Court to resist the temptation to go looking elsewhere in the statute for ambiguity as a reason why not to answer this case as to what the statute itself plainly says. And that's really, I think, the beginning and the end of it. And you can leave all that other stuff, if it ever comes back to the Court, for another day. If there are no other questions, I'll wrap up now. Roberts. Thank you, counsel. Mr. Bond. Mr. Chief Justice, and may it please the Court. The AGE Act expressly covers state and political subdivision employers regardless of their size. That is true for three reasons. First, that is by far the most natural reading of the text, given its ordinary meaning and consistent usage across Federal law. Second, Congress rejected a ready template in Title VII adopted just two years earlier that did exclude small state and local government employers by putting the definition or by putting government employers in the definition of person. Congress didn't do that and followed the FLSA template that it adopted at the same time in 1974. And third, Petitioner's contrary reading would leave a sizable loophole that would allow any employer to evade the AGE Act by outsourcing discrimination to small agents. And in order to avoid that problem, Petitioner is forced ultimately to abandon the core theory they offer of the text that treats the two clauses the same way. Now, in terms of the ordinary meaning, we agree with Respondent that the language also means and its usage throughout Federal statutes is clear, and it's clear that Congress used it in that ordinary way because it didn't follow the Title VII approach. Now, my friend on the other side suggests that the differences in the definitions of person in Title VII versus the AGE Act precluded Congress from doing the same thing. Now, those differences are actually quite slight. You can see them at pages 6 and 15 of the Blue Brief Appendix. But none of those differences prevented Congress in 1974 from doing the exact same thing in the AGE Act that a different Congress had done two years earlier in Title VII, if it had wished to do so. There are slight differences, of course, with the FLSA, but what's common to them is that they address the problem in the same way. They put the definition or they put governments in the definition of employer, not subject to any numerosity requirement. And that's the common thread. So just to touch on the questions that have reached the Agent Clause, that's where I think a real vulnerability for Petitioner's argument is. Now, it's true the Court doesn't need to address any of the broader issues or resolve the outer limits of that clause because it's not implicated here and nothing in this case turns on it. But I think it's important to bear in mind that whatever the Agent Clause means, it can't mean what Petitioner is offering here, because that interpretation, if you hold his interpretation to its logical conclusion, means that any employer could evade the AGE Act by outsourcing to small agents. The one thing we know the Agent Clause is supposed to do, for Manhart and other cases in the Title VII context, is to prevent what Manhart called delegating discrimination to corporate shells. But if you take Petitioner's reading seriously, it means that the second clause merely clarifies the first, so the 20-employee threshold reaches all the way to the government clause in the second sentence. If that's true, it has to follow logically that the 20-employee threshold reaches the Agent Clause in the middle. Now, I realize that Petitioner in the reply brief and this morning disclaims that result, but there's no way to square that disclaimer with the text. It would mean that the 20-employee threshold starts in the first sentence, skips over the Agent Clause, and lands on the government clause. And that's simply not a plausible way to read this statute, and it also is inconsistent with Petitioner's core theory that also means it has to operate the same way across both clauses here. So I think from the ordinary reading of the text and the way Congress has consistently used it in this statute, there's only one conclusion the Court can draw. Alito, if we follow the same plain text theory of interpretation that you advocate with respect to the provision concerning political subdivisions, wouldn't that lead us to the conclusion that an agent of an employer includes the employer's employees? Aren't they agents of the employer? So, Your Honor, again, you don't have to address that here, but no other? Well, I know we don't have to address it, but we have to have a theory, an understanding of the statute that makes sense, and you just made an argument based on the Agent Clause. Sure, and the answer to your question is we don't think that it would reach individual liability because of the two additional questions that Response Counsel just identified. And just to highlight those a little bit more, in the meaning of agent, not only did Congress have no reason to use agent in its broadest sense because employees would already trigger respondeat superior liability, in this statute Congress didn't use language that it has used in other statutes like the FLSA that lower courts and the Department of Labor have read to include individual liability. So if I can point you to one example, the FLSA section 203d at page 1a of the appendix to our brief says that an employer includes any person who acts directly or indirectly in the interest of an employer with respect to an employee. The FMLA, the Family and Medical Leave Act, uses the same language. Lower courts and the Department of Labor have construed those statutes to impose individual liability in some circumstances. You don't see that language in the Age Act, and I think it's a fair inference that Congress didn't intend to impose individual liability in that circumstance. Again, you don't need to resolve that, but that would be a strong contextual reason to reject that understanding. And in addition, even if you concluded that some subset of employees or supervisors were agents in some circumstances, I think you still would have to answer the question that the lower courts have consistently answered against individual liability by determining is this individual employee personally liable or is instead he liable only in his official or representative capacity. And the idea behind that is simple. If you are an employee and are counted as the employer only because you're acting as an agent, that is, only because you are exercising the authority of the employer in varying the terms and conditions of a particular employee's employment, liability naturally runs against the employer whose authority you are exercising. And to resolve that question, you would need to consider a number of principles that govern remedies law, and you'd need to take cognizance of potential spillover effects for other Federal statutes, which we think is yet another reason not to delve into those issues here, because the only question you need to answer is does the agent clause add some category of additional agents. By its terms, it does, and it must do so to solve the problem that this Court identified in Manhart and Ellerth and other cases. Kagan is that true, Mr. Bond, because on Petitioner's theory, which is to say that this is just a reference to respondeat superior liability and basically says that the employer shall have such liability for any agent, wouldn't that include these corporate shells that you're talking about? So a few points on that, Your Honor. First, if Respondeat or Petitioner is correct that the clause simply codifies existing principles of respondeat superior and agency liability, no, the employer would not face liability for acts of independent agents, at least in the ordinary course. The general rule is that unlike respondeat superior liability, a principle is not responsible for acts of independent agents unless you specifically intend the result. Independent contractors, is that what you meant? Independent agents, so agents that are not employees, non-employee agents, which can include independent contractors. But even in the face of statutory language that says the agent of such a person? So, I mean, these corporate shells are acting as the agent of such a person. So let's distinguish two things. As I understand it, Petitioner is urging that the clause would incorporate Respondeat superior and ordinary agency principles, which under Restatement Section 250 of Agency and 409 of Torts would not pick up acts of agents who are not employees in the ordinary course. Now, if what you're suggesting is that the language or the reference to agents here incorporates a broader theory of agency liability, that still leaves Petitioner with a difficulty of squaring how the two clauses work, because he says the agent clause and the government clause must operate in the same way. But you can't read the two clauses as doing those fundamentally different things, one creating a novel principle of agency law and the other incorporating an employee numerosity requirement that doesn't apply to agents in the middle. So that's a little bit of a dilemma. Roberts. I'm not sure what's so bad about direct agent liability. I mean, let's say you have the manager who runs the shop, the factory, and he decides, well, I'm going to fire everybody over 45 or whatever it is, and, yes, maybe the person fired wants to sue the company, but maybe the company is bankrupt. I mean, what's the big deal about it would seem to me that that would allow you to sue the person responsible for the decision? So we agree that it's not so anomalous as Petitioner suggests. There are Federal statutes that lower courts and agencies have construed as imposing that kind of liability. And that's, again, another reason why you don't need to delve into that here. The answer is not clear. We think that there are strong contextual indicators that in this statute Congress didn't intend to achieve that result. But you're right. If that's the conclusion at the end of the day in a case where it's properly presented that there is some individual liability, that's much less anomalous than reading the text in a way that no dictionary or other statute uses it and creating a huge loophole for outsourcing to agents of any size under 20 employees. If the Court has no further questions, we ask that you affirm. Roberts. Thank you, counsel. Mr. Rosenkranz, 5 minutes. Rosenkranz, thank you, Your Honor. A few just brief points. First, Mr. Fisher's explanation of agency is at war with Burlington. This Court said that the reason that there is respondeat superior in Title VII is because of the agent clause. Nothing else created that. The difference between Title VII and Title IX here is crucial. Gebser said Title IX has no respondeat superior liability. Why? Because it did not have an agent clause. Now, I'm not saying that there is no liability for that third-party agent. Of course there's liability. The agent clause here doesn't just implement respondeat superior. It implements agency principles as to both employees and the independent agent. That doesn't mean that agents themselves have to have 20 employees. That's clear from the wording of the statute. So you start with B. It says the employer is anyone who has 20 employees, is a person who has 20 or more employees, and also affects commerce. Then it says that also means any agent of such person. The such person is the employer who needs 20 employees. The agent does not need 20 employees. So let me just go to an observation about the relationship between the FLSA and Title VII. Mr. Fischer and Mr. Bond both point out that there's a distinction between the FLSA and Title VII in this Court's jurisprudence. It's a procedure substance distinction, though. Anything that is substantive, this Court has typically referred to Title VII as the analog. So I recognize, Your Honors, that neither reading is perfect, but it really is a matter of choice. It really comes down to a choice between a reading that is at worst mildly ungrammatical and one that is wildly untenable. Respondents are attributing to legislative drafters a level of grammatical sophistication that is unrealistic. Meanwhile, the list of problems that Respondents are creating with their reading is really untenable. First, it is unfathomable that Congress would have singled out public entities for harsh treatment in a statute whose whole purpose was to bring public employees into the ambit that private employees occupy. Second, Respondents rewrite the statute so that agent means independent third-party contractor, and they say employees are not agents. You cannot just wave around or wave away the problems that are created by that reading. It is not peripheral. Twelve regional circuits all agree with our reading, and that is all moved away under Respondents' reading. Third, Respondents have not explained why Congress would have stripped public employees of valuable rights such as respondeat superior liability that private employees have. The protection is not in the word employer. It's in the agency clause. But at a minimum, public employees under Respondents' reading lose all recourse for the acts of third-party contractors. That is at least clear. So since there's a reasonable reading of the statute that achieves Congress's stated goal without creating any of this mischief, that is the reading that this Court should adopt. If there are no further questions, we respectfully request that the Court reverse. Roberts. Thank you, counsel. The case is submitted.